Lyle BUETTNER, Plaintiff and Appellant,

v.

Ward NOSTDAHL et al., Defendants and Respondents.

Civ. No. 8848.

Supreme Court of North Dakota.

Jan. 18, 1973.

Thompson, Lundberg & Nodland, Bismarck, for plaintiff and appellant.

Mitchell Mahoney, of Pringle & Herigstad, Minot, for defendants and respondents.

ERICKSTAD, Judge.

By complaint dated the 14th of January 1971, the plaintiff Lyle Buettner commenced an action against the defendants Ward Nostdahl, Bennie Bechtold, Harold Anderson, and Dennis Meyer. In essence, the plaintiff alleges:

(1) That in the year 1968 he was approached by the defendants and asked to commence a cattle-feeding operation on their land south of Riverdale, North Dakota, which operation was to utilize the sugar-beet tops from their irrigated sugar-beet field;

(2) That the defendants represented to him that he would net approximately $33,640 per year on the cattle-feeding operation, which was to be exclusively his in consideration for his management and work in connection with the sugar-beet operation on the defendants' land;

(3) That in reliance upon the defendants' representations he terminated his employment with Budd's Welding Company in Minot, North Dakota, with the understanding that the defendants were to pay him $500 per month, which was to constitute a loan to be returned at the end of each cattle-feeding season, unless a sugar-beet crop failure occurred, in which case the $500 per month should then constitute his pay for the work done on the defendants' land;

(4) That he devoted great time and effort in obtaining information and knowledge to equip him for the operation of the defendants' business, to be known as the Terra Flats Company, and further that he incurred great expense in moving his family from Minot to Riverdale and in obtaining employment for his wife as a schoolteacher there;

(5) That at the end of the first crop year after the sugar-beet crop had been harvested, he was informed that the defendants backed out of their agreement and was told by defendant Dennis Meyer that he should leave the defendants' property and stay away; and

(6) That as a result of the defendants' breach of contract he has incurred special and general damages in the sum of $40,000. The complaint prays for judgment in the sum of $40,000 plus interest, costs, and disbursements.

At the time of the trial, Mr. Buettner moved to amend the prayer for relief to ask for $120,000, on the ground that the agreement was to continue for a three-year

period with an option to extend it one more year. This motion was granted.

By amended answer dated the 12th of November 1971, the defendants (1) Generally denied the material allegations of the complaint; (2) Asserted that the complaint failed to state a claim upon which relief could be granted; and (3) Asserted that the alleged contract upon which the plaintiff's action is based is not in writing which has been subscribed by the defendants or their agents.

The plaintiff's case consisted of testimony of Harold Anderson, one of the defendants, who was called for cross-examination, and testimony of Mr. Buettner. At the close of the plaintiff's case, the defendants moved for a dismissal of the complaint under Rule 41(b) of the North Dakota Rules of Civil Procedure. The defendants based their motion on the ground that the claim for relief was based upon a contract that was to run for a period of three years, with an option to renew it for a fourth year; that there was nothing in writing corroborating this contract, other than plaintiff's Exhibit 1; and that this exhibit did not meet the requirements of the statute of frauds. The court granted the motion for a dismissal, stating that the exhibit is a mere memorandum which fails to identify the parties, fails to show the subject matter involved, fails to express the consideration, and fails to disclose the terms and conditions of the contract, and is not signed by the party sought to be charged, as required by Section 9–06–04, Subsection 4, of the North Dakota Century Code.

Based upon findings of fact, conclusions of law, and order for judgment dated the 26th day of April 1972, the judgment dismissing the plaintiff's complaint was executed as of the 27th of April 1972.

Mr. Buettner now appeals from said judgment by notice of appeal dated July 24, 1972.

The essence of Mr. Buettner's appeal is that a certain memorandum in the handwriting of one of the defendants, namely Ward Nostdahl, and partial performance of the contract by Mr. Buettner take the contract out of the statute of frauds.

We shall attempt to set forth herewith the handwritten memo, designated plaintiff's Exhibit 1 and as defendants' Exhibit A, as we read it.

| | |
|---|---:|
| "500 head X 2.5 gain = 1250# X 170 = 212500 X 25 = | $ 53,100.00 |
| "15 lbs. silage X 500 = 7500 X 170 = 638 Ton | —0— |
| "3 lbs. alfalfa X 500 = 1500 X 170 = 128 Ton | 2,560.00 |
| "2 lbs. oats X 500 = 1000 X 170 = 5300 bu. X T 50¢ = | 2,650.00 |
| "Int. at 7% on 50,000 = | 1,750.00 |
| "4¢ loss on resale = 16.00 per animal = | 8,000.00 |
| "4% loss = | 2,000.00 |
| "Hauling, putting up silage, manure, etc. X 5.00 per head = | 2,500.00 |
| | 19,460 00 |
| [A8045] "Net | $ 33,640.00" |

The pertinent parts of our statute of frauds follow:

"9–06–04. Contracts invalid unless in writing.—Statute of frauds.—The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

"1. An agreement that by its terms is not to be performed within a year from the making thereof;

\* \* \* \* \* \*

"4. An agreement for the leasing for a longer period than one year, or for the sale, of real property, or of an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing subscribed by the party sought to be charged." N.D.C.C.

In the instant case, the judgment results from a motion to dismiss, made under Rule 41(b) of the North Dakota Rules of Civil Procedure. The pertinent part reads:

"(b) Involuntary dismissal—Effect thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the pre-

sentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. * * *" Rule 41(b), N.D.R.Civ.P.

■ We have recently held that when considering the validity of a ruling which grants a defendant's motion for dismissal of a plaintiff's complaint, this court must consider the evidence in the light most favorable to the party against whom the motion is made. Thompson v. Nettum, 163 N.W.2d 91, Syl. ¶ 1 (N.D.1968).

■ It is obvious that in viewing the evidence in the light most favorable to the plaintiff that the memorandum does not satisfy the statute of frauds, in that it is not subscribed by the party to be charged, although the alleged contract involves a cattle-feeding arrangement and real-estate lease for a longer period than one year.

The more difficult question is whether, when considering the evidence in the light most favorable to the plaintiff, the plaintiff has proved sufficient partial performance to take the case out of the statute of frauds.

In this case, the defendants Ward Nostdahl, Bennie Bechtold, and Dennis Meyer did not testify. The defendant Harold Anderson was called for cross-examination by the plaintiff. He testified in essence as follows:

Terra Flats, a beet farm at Riverdale, North Dakota, is currently a partnership of Harold Anderson and Ward Nostdahl, but at the time that Lyle Buettner worked on the farm, in 1968, there were two other partners, the defendants Bechtold and Meyer. Lyle was hired to work for the partners, although the actual hiring was done by Ward alone, and the cattle deal was between Ward and Lyle alone. The partnership was going to furnish beet tops for feeding the cattle as an incentive for Lyle to work on the beet farm for the partners, but the cattle were not to be a part of the Terra Flats partnership.

Harold was aware that working on the farm required Lyle to move his family from Minot to Riverdale and that Mrs. Buettner had returned to school over the summer in order to qualify to teach in Riverdale.

Lyle and Ward were going to go into the cattle business; Lyle was to be paid $500 a month for his farm labor during the beet season, which payment was to continue during the winter months. Lyle was to repay the money received during the winter months from profit derived from the cattle business.

The partnership provided Lyle with a pickup, along with oil and gas for it, and a house trailer for him to live in on the farm.

On September 21, 1968, Lyle told Harold that Ward was "trying to chisel out of his cattle bit." Lyle went to work for Schilling the following Monday. He told Harold that his actual monetary loss had been $1,500, and Harold offered him $400 to avoid hard feelings. Harold paid $200, but made no more payments after he learned of Lyle's legal action.

A pasture was set aside on the farm for Lyle's use in feeding cattle, and the partnership spent more than $2,000 on a machine that would remove the beet tops in such a way that they could be saved for cattle feed. An ordinary machine to remove the tops without preserving them would have cost approximately $800.

Lyle Buettner's testimony, in essence, follows:

After Ward sold his interest in the welding business where Lyle worked and was no longer his employer, Ward invited Lyle

to his house and asked if he would be interested in working on the beet farm. Lyle said he would be interested only if he could make more money than he was earning at his welding job. In a later conversation, Ward described his beet-farm partnership to Lyle and told him the partners were interested in finding someone to work for them on the farm. Ward told him they could reach an agreement, but no money was discussed at that time.

In his third conversation with Lyle, Ward discussed the possibility of feeding cattle during the winter months at Terra Flats and gave Lyle the piece of paper with writing upon it [defendants' Exhibit A], which indicated that he was to receive a net profit of $33,640 for 170 days of cattle feeding, which was not to be shared with Ward. Ward implied that the cattle deal was to be between Lyle and all four partners and he said that if Lyle could not borrow the money himself, either the "company" or Ward himself would deal with the bank. When Lyle went to the bank he was informed the bank would loan him money when he was ready to begin his cattle enterprise, but that he would have to have a lease on the property involved. Ward told Lyle over a cup of coffee that he would stop at the bank "to draw up the lease to meet Seelig's specifications."

In the fall of the year, when no preparations had been made toward building the feeding operation, Lyle asked Harold about it and Harold said Ward had mentioned sheep instead of cattle. The "feeding operation" for 500 head of cattle would have cost approximately $60,000 to construct and was to have been provided by the partnership. Ward told Lyle that Dennis Meyer, one of his partners, who worked with the ASCS office would have the knowledge to help design it so that Lyle could feed 500 head of cattle in two hours or less, and that if Lyle did not like the machinery provided by the partnership he would have to buy his own.

Lyle stated that the "original paper" covered work for three years and could be extended to the fourth year and then be renegotiated.

Prior to going to Terra Flats, when Lyle met with the four partners at a cafe, Bennie Bechtold mentioned $6,000, which was something new to Lyle. There were too many disruptions for a thorough discussion, but Lyle told Bennie that he was not going to work on the farm for $6,000 and that his interest was in the cattle deal. There was no further discussion of that matter, except for Ward's saying later in the evening, "You'll never regret making this move."

Some time later Ward called Lyle and told him some machinery was ready to be hauled to the farm and Lyle proceeded to take the machinery to Terra Flats. During the summer he did necessary farm work at the direction of the partnership and it was not until late August or early September he became suspicious about the likelihood of getting the "feeding operation" built on time to accommodate cattle during the winter. He was to resume working for the partnership in April and to feed cattle for 170 days before that, so he figured they had only ten days left to build the facilities and nothing at all had been done in that direction. Lyle had, earlier in the summer, inquired of Dennis, the ASCS employee, when he was going to dig the well that Ward had mentioned to Lyle could be dug with a soil machine. Dennis said the machine belonged to the government and could not be used to dig the well. Ward told Lyle that he would dig a hole adjacent to the 40 acres planned for the feed lot and Lyle could string a pipe across the road to water the cattle.

Lyle returned to Terra Flats the following spring when all four partners were there and tried to discuss the matter with them, but was ordered off the property. Harold offered him $400 then, and Ward told Lyle, "This cattle deal was just between you and I." Later Ward said, "I don't like people going around accusing me of stealing tinsnips." Lyle testified he still does accuse Ward of "stealing tinsnips".

As Lyle prepared to leave the farm, Harold asked for two weeks to try to reach some kind of an agreement with the other partners. Lyle telephoned him three weeks later and Harold said he needed more time than that.

To come to Terra Flats, Lyle moved his wife and five children from Minot to Riverdale, and his wife went to summer school in order to qualify for a teaching job in Riverdale. She signed a contract for the 1968–69 school term, which required her to remain in Riverdale after Lyle left Terra Flats. Lyle then commuted daily to his new job in Minot. He was able to find only occasional renters for his house in Minot.

During the time Ward Nostdahl was discussing the feeder operation with him, Lyle read a great deal of material on the subject, including a Morse feeding book that Ward gave him.

Lyle testified, in essence, to the following on cross-examination:

He was 39 years old, a high school graduate, had worked on a farm from age 12 to age 21, at which time he entered the military service.

In 1965 he went to work for Budd's Welding in Minot, trucking oxygen from Minneapolis to Minot. Ward owned half of Budd's Welding and told Lyle that he felt that Lyle would not continue to work for $500 a month, so he gave him a small increase in pay and offered him an equity in the business. Then they established an oxygen-nitrogen plant in Minot, which Lyle operated for $500 a month until it was sold. Thereafter, the new owners paid him $540 a month. At the time they set up the oxygen plant, Ward offered Lyle a one-third interest in the business; however, at a later time he asked Lyle to purchase stock in the company. Lyle refused to buy it with nothing on paper, so another person was sold a one-third interest in the oxygen plant. Questioned about his one-third interest in the company, Lyle said: "Yes, sir. For my half of the oxy-gen. * * * I was paid a salary because I was to get from the company, and the whole works, two of us—I was to draw $500.00 cash from the company, but all profits was to go into the company. Eventually, when it got paid off, well, then, go from there. Ward Nostdahl told me at that time, just like an investment, i+ would be money in the bank. Might be a long time before I got it out. Eventually, come out."

He was told that the welding company had been sold for $250,000, but he was only given $1,000 as a payment for his over-time work there.

Lyle said that the $500 a month he was paid during the summer months on the farm was a loan from Ward, to be repaid later. The payment for the work done for the partnership was to have been the beet tops to feed his cattle, along with the use of the 40-acre lot. Lyle said: "That's what Nostdahl represented to me. If the other three—or two weren't on it, I don't know. This is what Nostdahl represented to me."

Lyle said that he had expected the entire $33,640 profit to go to him and that he understood the farm lease was to run for three years, with an option. He paid income tax on the money paid to him during the summer. "Reported as a loan, just like it was. Paid taxes on it, though, so I could refile again."

As to the beet-topper the partnership purchased, Lyle said he didn't believe they bought that for his benefit alone.

The plaintiff contends that Harold Anderson's testimony affirms the terms of the agreement, with the one exception that he disassociates himself from the agreement and states that it was Ward Nostdahl's deal.

In support of his contention that his part performance of the contract takes it out of the statute of frauds and that the doctrine of part performance has been applied frequently in North Dakota, he cites: Fideler v. Norton, 4 Dak. 258, 30 N.W. 128 (Dako-

ta Territory 1886); Fideler v. Norton, 4 Dak. 258, 32 N.W. 57 (Dakota Territory 1887) (dissenting opinion); Ketchum v. Zeeland Mercantile Co., 29 N.D. 119, 150 N.W. 453 (1914); Erickson v. Wiper, 33 N.D. 193, 157 N.W. 592 (1916); and Wood v. Homelvig, 68 N.D. 735, 283 N.W. 278 (1938).

Let us consider those cases in light of the facts in the instant case.

In *Fideler*, the defendants demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The trial court sustained the demurrer and dismissed the action, and upon appeal to the supreme court the only issue the supreme court had before it was whether the complaint contained allegations which, if true, would sufficiently set forth a cause of action (the demurrer admitting the truth of the allegations). The supreme court, stating that "Equity will never willingly permit the statute of frauds to be used as a shield in defense of fraud", and finding a fiduciary relationship existing between the parties, held that the complaint stated a sufficient cause of action in that it alleged part performance of the oral contract in the delivery by the plaintiff to the defendants of a receiver's receipt, upon which was endorsed a formal relinquishment of the land to the United States. Fideler v. Norton, *supra*, 30 N.W. 128 at 132. In the instant case a fiduciary relationship is neither alleged nor proved.

In Ketchum v. Zeeland Mercantile Co., *supra*, Ketchum brought a suit in equity to compel specific performance of an alleged oral contract to convey a lot in the Village of Zeeland. In finding sufficient part performance to take the case out of the statute of frauds, the court said:

"The actions of the parties, the books of account, the written note and memorandum referred to, the knowledge of all the officers of the corporation of its books and all these transactions, including the many payments made, final set-

tlement by note, the fact that the sale of the lot was made by the treasurer, with his mother, the manager and president of the corporation, present, with the father and one other director, the secretary, assisting in running the corporation business, and with knowledge in all of them that within 30 days after the initial payment had been made on the lot plaintiff had assumed control and started to build thereon, and occupied it for nearly a year, as well as the total failure of the defense on facts, all lead to the only conclusion possible under the evidence, and that is, that the defense is utterly without merit. These facts render needless any extended discussion of the statute of frauds. The initial payment, subsequent payments, attempted performance by defendant, and the memorandum agreement and performance thereunder take the case from under the operation of that statute." Ketchum v. Zeeland Mercantile Co., *supra*, 150 N.W. 453, 454.

The performance in *Ketchum* goes much beyond the performance in the instant case. In the instant case, we have little or no performance of that part of the alleged oral contract relating to the cattle-feeding operation; all the performance on the part of the plaintiff fits into an employment contract for wages, notwithstanding the fact that the plaintiff received slightly less money monthly in conjunction with the Terra Flats operation than he did when employed in the city of Minot. The other benefits that he had at Terra Flats, including the free trailer use and the opportunity in the future of free house use, as well as the free use of a pickup and the gas and oil necessary to run it, more than make up for the loss in monthly salary.

In Erickson v. Wiper, *supra*, Mrs. Erickson contended that she joined with her husband in the conveyance to Wiper of a quarter section of farmland which constituted her homestead, with the understanding that she was to receive from Wiper the difference between the mortgage indebted-

ness upon the land of $2800 and the sale price of the land, which she contended to be $5000. Mr. Wiper contended that the sale price was $4000. In sustaining the verdict of the jury, which adopted Mrs. Erickson's view of the oral contract, the majority of the court, speaking through Judge Christianson, held that Mrs. Erickson's action was not barred by the statute of frauds. The court said:

"The verbal agreement upon which plaintiff's cause of action is predicated was fully performed by her in compliance with its terms. Defendant received an instrument of conveyance executed and acknowledged by plaintiff and her husband. This instrument was concededly sufficient to effect a release of plaintiff's homestead interest in the premises. Defendant not only received but accepted such instrument of conveyance and caused the same to be recorded, and afterwards proceeded to exercise dominion of ownership over the premises in question.

" 'The statute of frauds has no application where there has been a full and complete performance of the contract by one of the contracting parties, and the party so performing may sue upon the contract in a court of law. He is not compelled to abandon the contract and sue in equity or upon a quantum meruit. Particularly is this said to be true where the agreement has been completely performed as to the part thereof which comes within the provisions of the statute, and the part remaining to be performed is merely the payment of money or the performance of some act the promise to do which is not required to be put in writing. * * * Thus, where lands have been actually conveyed and possession taken in accordance with the terms of a contract within the statute, the vendor may recover the consideration agreed upon.' 29 Am. & Eng. Enc. L. 832." Erickson v. Wiper, *supra*, 157 N.W. 592, 595, 596.

It should be noted that two of the judges, namely Judge Goss and Judge Burke, dissented. Judge Goss dissented upon the ground that the plaintiff's recovery was barred by the statute of frauds.

In Wood v. Homelvig, *supra*, Wood alleged that he leased certain land to Homelvig and that as a consideration Homelvig agreed to pay the taxes on the premises for the year 1925 and subsequent years as rent for the use of the land; that Homelvig failed and neglected to pay such taxes without informing Wood of that fact; that by reason of Homelvig's failure to pay the taxes the land was sold for taxes to Slope County on the 14th day of December 1926; that thereafter on the 9th of May 1930 a tax deed was issued by the county auditor to Slope County, and that in June of 1930 Homelvig purchased said land from Slope County; that Homelvig concealed all of these facts from Wood and that Wood did not become aware of these facts until March 1933.

From Homelvig's testimony and from letters which he had written to Wood, the supreme court concluded that Wood was the true owner of the land and accordingly affirmed the trial court's judgment in favor of Wood.

Pertinent is the following from *Wood*:

"Counsel for the defendant contends that there was no written lease between the parties and if there was any lease at all, it was merely a verbal one and was therefore void under the statute of frauds. Such contention is without merit. In his letters written to the plaintiff and which are set out in this opinion, the defendant recognizes the plaintiff's ownership and his title to the land. He also specifically agrees to pay the taxes and he takes possession of and occupies the land. The plaintiff relied on the statements made by the defendant, and since both parties acquiesced in the agreement and proceeded to carry out its terms, obligations were thereby created which became binding on both. But even if the lease were verbal and within the statute of frauds so that neither party could enforce its terms against the other, yet, if

the lessee enters into possession under the lease and the lessor consents thereto, the obligations thus created are binding and the statute of frauds does not apply." Wood v. Homelvig, *supra*, 283 N.W. 278 at 283.

It is our view that Wood v. Homelvig and the instant case are clearly distinguishable upon the facts.

In none of the North Dakota decisions referred to us and considered herein was the court asked to stretch the doctrine of part performance to the extent that we are herein asked to stretch it today. If the statute of frauds is to continue to have any meaning in our State, it would seem that it should apply in the instant case where the provisions of the alleged oral contract are so incredible. We do not think it reasonable that an experienced businessman would obligate himself individually or as a member of a partnership to the financial extent herein contended necessary for the construction of the cattle-feeding facilities unless he or the partnership were to participate substantially in the expected profits.

 We believe that the proper approach to the question presented by this case is best enunciated by the supreme court of Washington in a very recent decision, as follows:

"As evidenced by the test required in this state to successfully assert part performance, the court's overriding concern *is precisely directed toward and concerned with a quantum of proof certain enough to remove doubts as to the parties' oral agreement:*

" 'The first requirement of the doctrine that part performance of an oral contract exempts it from the provisions of the statute of frauds is that the contract be proven by evidence that is clear and unequivocal and which leaves no doubt as to the terms, character, and existence of the contract. * * *

" 'A mere preponderance of the evidence is not sufficient. If the evidence leaves it at all doubtful as to whether or not a contract was entered into, the court will not decree specific performance. * * *

\* \* \* \* \* \*

" 'Another requirement of the doctrine * * * is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they point to some other relationship, such as that of landlord and tenant, or may be accounted for on some other hypothesis, they are not sufficient. * * *' Granquist v. McKean, 29 Wash.2d 440, 445, 187 P.2d 623, 626 (1947)."

Miller v. McCamish, 78 Wash.2d 821, 479 P.2d 919 at 923, 924 (1971).

In Parceluk v. Knudtson, 139 N.W.2d 864 (N.D.1966), a quite recent decision of this court, Judge Strutz, speaking for this court, said:

" * * * whenever acts have been done which are of such a nature as to be consistent only with the existence of a contract for the sale of real property, the case is held to be taken out of the statute of frauds." Parceluk v. Knudtson, *supra*, 139 N.W.2d 864, 871.

 The inference to be drawn from that statement for this case is that the part performance to take the case out of the statute of frauds must be consistent only with the existence of the alleged contract.

 We do not believe that the part performance in the instant case is consistent only with the existence of the alleged oral contract.

For the reasons stated herein, the judgment of the trial court is affirmed.

STRUTZ, C. J., and ERICKSTAD, PAULSON, KNUDSON and TEIGEN, JJ., concur.