**Fred HOFMANN, Plaintiff and Appellee,**

v.

**Don STOLLER, Defendant and Appellant.**

**Civ. No. 10105.**

Supreme Court of North Dakota.

June 10, 1982.

Hjellum, Weiss, Nerison, Jukkala & Wright, Jamestown, for plaintiff and appellee; argued by John Hjellum, Jamestown.

Garaas Law Firm, Fargo, for defendant and appellant; argued by David Garaas, Fargo.

ERICKSTAD, Chief Justice.

John Stoller appeals from a judgment entered in the District Court of Stutsman County in the amount of $6,328.07, together with costs in the sum of $138.00, making a total judgment of $6,466.07. The court held that the statute of frauds was unavailable to Stoller as a defense, and dismissed his counterclaim against Hofmann. We affirm.

This action arose out of an alleged contract between Fred Hofmann and Don Stoller. Fred Hofmann is Don Stoller's uncle. Hofmann is a dairy farmer who owned two separate sets of buildings which could be used in dairy operations. Hofmann and his family occupied one of the sets of buildings and conducted a dairy operation at that site. The other set of buildings was rented by Stoller. That set of buildings consisted of a house in which Stoller lived and a barn which Stoller used in conjunction with his dairy operation.

The initial oral lease between Stoller and Hofmann was entered into on March 1 of 1978 and was to run to March 1, 1979. Through that lease Stoller rented 280 acres of cultivatable farmland and the above-described house and barn. The barn located on the premises rented by Stoller burned down on May 5, 1978. What transpired thereafter between Hofmann and Stoller is the subject of this dispute.

At the time the barn was destroyed, Stoller was milking approximately 40 cows. The fire left him with no place to milk his cows. Because Stoller was anxious to continue his dairy operation with the now displaced cows, the parties attempted to work out an arrangement whereby this could be done. The parties apparently agree that it was decided that Stoller would move his cows to Hofmann's home place and conduct his dairy operations there. Because Hofmann was also milking about 40 cows at his home place, the two made arrangements to facilitate two separate dairy operations at one site. The agreement was that Hofmann was to milk his cows first. Thereafter Stoller was to milk his cows and clean the barn. Hofmann also provided 80 acres of alfalfa and brome grass on which Stoller's cows were permitted to graze. While Stoller's cows were milking, they were fed a commercial feed ordered and paid for by Hofmann. This much the parties agree to. They disagree as to whether or not Stoller was to pay for commercial feed, minerals, electricity and pastureland.

Stoller contends that Hofmann told him he would have the barn replaced by July 4, or approximately two months after its destruction. Stoller asserts that because of this short period of time, because Hofmann liked him, and because he had done many things for Hofmann in the past, Hofmann told Stoller he could have all the feed and minerals eaten by his cows, his share of the electricity, and the pastureland free. Hofmann contends that he and Stoller agreed to split the cost of feed, minerals and electricity, and that Stoller agreed to pay $20 per acre for the 80 acres of pastureland. Under Hofmann's version of the agreement Stoller owes Hofmann the following:

| | |
|---|---:|
| Feed (½ of $8,957.20) | $4,478.60 |
| Minerals (½ of $210.00) | 105.00 |
| Grazing pasture (80 acres @ $20.00 per acre) | 1,600.00 |
| Electricity (½ of $893.00) | 446.50 |
| TOTAL | $6,630.10 |

Under Stoller's version of the agreement Hofmann provided everything without cost to Stoller.

Stoller asserts the statute of frauds as a defense. The trial court apparently severed the contract for purposes of considering the statute of frauds defense. As for the agreement for feed and minerals, the trial court concluded that the statute of frauds relating to goods, Section 41–02–08, N.D. C.C., was not available to Stoller as a defense, as follows:

"Section 41–02–08 NDCC is not applicable as a defense in this case by reason of estoppel. Under oral agreement, such feed was purchased in the name of [Hofmann] and the expense was to be shared

equally between [Hofmann] and [Stoller] in feeding their cattle, which was *received and accepted* in the feeding of [Stoller's] cattle." Memorandum decision. (Emphasis added.)

After concluding that the feed contract was not invalidated by the statute of frauds (Section 41–02–08(1), N.D.C.C.), because it came within Section 41–02–08(3)(c), N.D.C.C., the court held that the lease between Hofmann and Stoller for 80 acres of pastureland was excepted from the statute of frauds pertaining to the leasing of real property, Section 9–06–04, N.D.C.C., because the lease ran for a period of less than one year.

■ Stoller argues that the trial court erred by excepting the agreement between him and Hofmann for the purchase of feed and minerals from the statute of frauds. § 41–02–08(1), N.D.C.C. Before addressing the merits of Stoller's argument, however, we must determine whether or not the trial court's severance of the agreement between Hofmann and Stoller was proper. Such a determination is necessary because if a contract is not severable, and part of it is within the statute of frauds, it is unenforceable as a whole, and no action can be maintained to enforce the part which would not have been affected by the statute of frauds if it had been separate and distinct from the other part. *Dehahn v. Innes*, 356 A.2d 711, 716 (Me.1976).

■ A contract is severable if it is susceptible of division and apportionment by virtue of its having two or more parts not necessarily dependent on each other. *Vanston v. Connecticut General Life Insurance Company*, 482 F.2d 337, 342 (5th Cir. 1973); *Upson v. Fitzgerald*, 129 Tex. 211, 103 S.W.2d 147 (1937). Stated another way, the test is whether or not the parties consented to all the promises as a single whole, so that there would have been no bargain whatever if any promise or set of promises were struck out. *Dehahn v. Innes*, 356 A.2d 711, 716 (Me.1976). Thus, the severability or entirety of a contract depends upon the intent of the contracting parties and in the case of an oral contract is a question of fact for the fact finder. *Id.*

Although the trial court made no specific finding of fact relative to the severability of the contract between Stoller and Hofmann, in its memorandum decision it treated the agreement as severable by addressing each element of the agreement separately. Additionally, it applied separate statutes of fraud to the agreement concerning feed and minerals and to the agreement concerning the grazing pasture.

■ Findings of fact will not be set aside unless they are clearly erroneous. Rule 52(a), North Dakota Rules of Civil Procedure; *Hoge v. Burleigh County Water Management District*, 311 N.W.2d 23, 28 (N.D. 1981).

■ We do not find the trial court's implied finding of severability to be clearly erroneous. Therefore we will consider each of the agreements between Hofmann and Stoller separately.

First, we must decide whether or not the statute of frauds governing goods, Section 41–02–08, N.D.C.C., (§ 2–201 U.C.C.), precludes Hofmann from enforcing the contract relative to the feed. That section provides:

"Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."

The trial court held the contract enforceable because of Stoller's receipt and acceptance of the feed. The "received and accepted" exception to the statute of frauds, which is a delineation of the part performance necessary to make enforceable an oral contract not in compliance with the statute of frauds, provides:

"3. A contract which does not satisfy the requirements of subsection 1 but which is valid in other respects is enforceable

\*      \*      \*      \*      \*      \*

c. with respect to goods for which payment has been made and accepted or which have been received and accepted (section 41–02–69)." § 41–02–08(3), N.D.C.C.

Stoller argues that the trial court erred by using an improper standard of proof to determine whether or not his part performance should except his contract with Hofmann from the statute of frauds. The trial court used a "greater weight" or preponderance of the evidence standard in determining that an oral contract was made by Hofmann and Stoller for the sale of feed. Stoller argues that *Buettner v. Nostdahl*, 204 N.W.2d 187 (N.D.1973), requires that a court find the existence of a contract by "clear and convincing" evidence before the doctrine of part performance excepts a contract from the statute of frauds. The statute of frauds at issue in *Buettner v. Nostdahl*, however, was not the Uniform Commercial Code statute of frauds and the test in that case is therefore not applicable to this action. *Merwin v. Ziebarth*, 252 N.W.2d 193, 197 (N.D.1977). We said in *Merwin v. Ziebarth, id.*, that non-code law is not to be used in situations in which non-code law has been displaced by a particular U.C.C. provision. It is apparent from the comment to Section 2–201 of the Uniform Commercial Code (§ 41–02–08, N.D.C.C.) that the statute of frauds relating to goods is a relaxed statute of frauds and is carefully drafted as such. *Id.* To apply the law of *Buettner v. Nostdahl*, 204 N.W.2d 187 (N.D. 1973), to a transaction in goods would violate the policy of the Uniform Commercial Code.

The Uniform Commercial Code statute of frauds relating to goods permits enforcement of oral contracts when the goods have been "received and accepted", it does not require proof of the existence of a contract by "clear and convincing" evidence. Acceptance is defined as follows:

"*41–02–69*. (2–606) *What constitutes acceptance of goods.*—1. Acceptance of goods occurs when the buyer

  a. after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

  b. fails to make an effective rejection (subsection 1 of section 41–02–65), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

  c. does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

"2. Acceptance of a part of any commercial unit is acceptance of that entire unit." § 41–02–69, N.D.C.C.

Acceptance contemplates unilateral action on the part of the buyer. Receipt, on the other hand, requires action by both the seller and buyer. As explained by Corbin in his treatise on contracts, acceptance and receipt are separate acts:

"Acceptance is the unilateral act of the buyer alone, or of his representative; it requires no action or expression on the part of the seller. Acceptance within the meaning of the statute is an expression of assent by the buyer to become the owner of specific goods as the subject matter of the contract made by him with the seller. Receipt, on the other hand, involves a change in possession of the goods; ..." [Footnote omitted.] 2 Corbin, *Contracts*, § 482, p. 642

Receipt requires the goods to change possession from the seller to the buyer. Thus, an affirmative bilateral action must occur. The seller must assent to the buyer's receipt of the goods. As Corbin states:

"Receipt, on the other hand, is a change in the physical relations of those specific goods to the seller and to the buyer; ...

*  *  *  *  *  *

"If the court finds that there has been a change in actual 'custody' of the goods, it will also find that there has been 'receipt' by the buyer; ..." 2 Corbin, *Contracts*, § 486, pp. 648–49.

Corbin also states in Section 487:

"The contract is not made enforceable against the seller unless he in some way

participates in or expresses his assent to the change in possession and control. Nor can possession be forced on the buyer so as to cause a sufficient receipt. If when delivery of the goods is tendered the buyer refuses them, there is no receipt even though the seller deserts the goods on the buyer's doorstep." [Footnotes omitted.] 2 Corbin, *Contracts*, § 487, p. 650.

■ In a goods transaction, therefore, where there has been delivery of the goods by the seller and acceptance of the goods by the buyer, the bilateral performance of the contract evinces the assent of both parties. *Gerner v. Vasby*, 75 Wis.2d 660, 250 N.W.2d 319, 324 (1977). Thus, the first element of the test set out in *Buettner v. Nostdahl*, 204 N.W.2d at 195, that is, that the existence of a contract be proved by clear and convincing evidence, is inapplicable to the U.C.C. statute of frauds and the court needs only to find that the goods have been "received and accepted". Whether or not it has been received and accepted is subject to Rule 52(a), N.D.R.Civ.P.

■ In this case, the trial court specifically found that the oral contract between Stoller and Hofmann was excepted from the goods statute of frauds, Section 41–02–08, N.D.C.C., because the feed in question was "received and accepted". This finding is not clearly erroneous.

■ Stoller next argues that the second element of the test in *Buettner v. Nostdahl*, 204 N.W.2d at 195, is not met in this case. That test requires that the "acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they point to some other relationship ... they are not sufficient." *Id.* Again, however, because of the application of the Uniform Commercial Code to this transaction, we have concluded that element of the part performance test inapplicable.

In respect to the sale of goods under the Uniform Commercial Code, the contract need not be "exclusively referable" to the oral contract. *Gerner v. Vasby*, 75 Wis.2d

660, 250 N.W.2d 319, 325 (1977). Comment 2 to Section 2–201, U.C.C. (§ 41–02–08, N.D.C.C.) reads:

"2. 'Partial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted.

"Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists. If the court can make a just apportionment, therefore, the agreed price of any goods actually delivered can be recovered without a writing or, if the price has been paid, the seller can be forced to deliver an apportionable part of the goods. The overt actions of the parties make admissible evidence of the other terms of the contract necessary to a just apportionment. *This is true even though the actions of the parties are not in themselves inconsistent with a different transaction* such as a consignment for resale or a mere loan of money." 1 Uniform Laws Annotated, Official Comment, § 2–201, U.C.C., p. 148.

In a case such as this, therefore, where the conduct that is relied upon for part performance is consistent with the contract, such conduct is sufficient to take the contract out of the statute of frauds even though the conduct is not inconsistent with some other arguable possible arrangement between the parties. We conclude that the delivery of feed by Hofmann and its receipt and acceptance by Stoller made the contract enforceable under Section 41–02–08(3)(c), N.D.C.C.

■ This requires us to address Stoller's next argument. He argues that even if a valid contract exists the trial court's finding that his cows consumed one-half the feed purchased is clearly erroneous. The trial court's finding, however, is supported by the evidence. Although Hofmann owned more cattle than Stoller, the evidence reveals that each were milking *approximately* 40 cows. Only the cows being milked were fed the commercial feed. Additionally,

Hofmann sold his cows in September and thus quit milking and using feed. Stoller continued to milk until November and the record reveals that he used feed beyond the time that Hofmann quit milking. We therefore conclude that the trial court's finding of fact is not clearly erroneous.

■ The award for the cost of feed included $630.58 for one-half the interest paid by Hofmann to the Medina Farmers Union Grain Company for late payment for the feed. Stoller argues this is prejudgment interest and that the court erred by making such an award. He argues that Section 32–03–04, N.D.C.C., limits the award of interest. We have concluded, however, that the court did not err in awarding the finance charges paid by Hofmann because the charges are recoverable as "incidental" damages under Sections 41–02–88 and 41–02–89, N.D.C.C. (2–709 and 2–710, U.C.C.). Section 41–02–88(1)(a), N.D.C.C. (2–709, U.C.C.), provides that a seller may recover the price of accepted goods, together with any incidental damages, from a breaching buyer:

> "*41–02–88. (2–709) Action for the price.*—1. When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price
> a. of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer ..."

Incidental damages recoverable by a seller in a goods transaction are set forth in Section 41–02–89, N.D.C.C. (2–710, U.C.C.), as follows:

> "*41–02–89. (2–710) Seller's incidental damages.*—Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

This must be contrasted with the damages a buyer is entitled to, which include both incidental and consequential damages, as follows:

> "*41–02–94. (2–715) Buyer's incidental and consequential damages.*—1. Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> "2. Consequential damages resulting from the seller's breach include
>
> a. any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> b. injury to person or property proximately resulting from any breach of warranty." § 41–02–94, N.D.C.C. (2–715, U.C.C.)

The difference between "incidental" damages recoverable by a seller, and "consequential" damages, which are not, is explained in *Petroleo Brasileiro, S.A., Petro. v. Ameropan Oil Corp.*, 372 F.Supp. 503, 508 (E.D.N.Y.1974), as follows:

> "While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."

In this action, Hofmann seeks recovery for the interest charged him by the Medina Farmers Union Grain Company. He asserts

the late payment fee was necessitated because he was waiting for Stoller's payment before paying the Medina Farmers Union. We believe the interest awarded Hofmann (one-half of the total interest) is recoverable as incidental damages. We are persuaded by the reasoning of the New York Court of Appeals in *Neri v. Retail Marine Corporation*, 30 N.Y.2d 393, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972); and the Second Circuit Court of Appeals in *Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017 (2d Cir. 1978). Those cases involved Section 2–708, U.C.C., providing for seller's damages upon a buyer's nonacceptance or repudiation of goods. Although we are concerned in this action not with *nonacceptance* of goods but rather with *nonpayment* of the price, the rationale of *Neri, supra,* and *Intermeat, Inc., supra,* is relevant to our discussion.

The Court of Appeals in *Neri*, in awarding damages to the seller under Section 2–708, U.C.C., allowed finance charges paid to a third party as part of the "incidental damages" provided for in Section 2–710, U.C.C. The court reasoned that the purpose of the U.C.C. was "to put the seller in as good a position as performance would have done." § 2–708(2), U.C.C. The Court of Appeals did not limit the scope of "incidental damages" to include only the activities enumerated in Section 2–710, U.C.C., such as transportation, care and custody of the goods. It gave broad meaning to the phrase "reasonable charges, expenses or commissions incurred", found in Section 2–710, U.C.C.

In *Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017 (2d Cir. 1978), the Second Circuit Court of Appeals applied New York law to a case in which the buyer rejected a shipment of meat. In adopting *Neri* as New York law, the court affirmed the trial court's award of statutory interest.

We believe the rationale of *Neri* is equally applicable to the situation with which we are confronted. The purpose of the Code of putting "the seller in as good a position as performance would have done" (Section 2–708(2), U.C.C.), was served by the trial court's award to Hofmann of damages for interest charges paid by him to the Medina Farmers Union Grain Company by reason of Stoller's breach of the contract. Such charges are recoverable as "incidental" damages. § 41–02–89, N.D.C.C. (2–710, U.C.C.) We therefore affirm the interest award. No contention has been made that the interest charges were unreasonable as such.

Next we address the trial court's award of the cost of electricity and the denial of costs for minerals. We will not disturb the trial court's findings of fact regarding the award of electricity in the amount of $446.50 and denial of recovery for $105.00 for minerals. The record reveals that electricity was used by Stoller and, although Hofmann's house was also connected to the meter, the evidence indicates that Stoller used more electricity in the milking barn than Hofmann. The record also discloses that Stoller did not feed his cows minerals. We therefore do not disturb those two findings of fact by the trial court.

The next issue we must address is whether or not the trial court's award of $202.97 for fuel oil used to heat the house leased by Stoller was proper. Stoller moved out of the house he was leasing from Hofmann in December of 1978. The testimony reveals that when Stoller moved out of the house the fuel oil tank was nearly empty, and Hofmann, upon discovery of the empty tank, filled it in order to provide heat so that the plumbing in the house would not freeze during the cold winter months.

Stoller contends that he was not required to purchase fuel to keep the home warm and prevent the pipes from freezing. He argues that under Section 47–16–13.1, N.D.C.C., it is the landlord's duty to supply heat unless the parties agree otherwise in writing. Stoller argues that there is nothing in this action to indicate that the parties entered into any agreement regarding heat, and that there is no writing concerning the heat. Additionally, he contends that his termination of the lease and vacation of the house was proper because of Section 47–16–17(2), N.D.C.C., which provides:

"2. When the greater part of the property leased, or that part which was, and which the lessor had reason to believe was, the material inducement to the lessor to enter into the contract, perishes from any cause other than the ordinary negligence of the lessee."

Stoller argues that the burning of the barn frustrated the lease and he was therefore justified in terminating it.

■ Stoller's argument fails. The trial court held that Stoller had a duty to notify Hofmann of his intent to terminate the lease. Finding that Stoller did not notify Hofmann of his termination, Stoller should not be permitted to rely on the provisions of the North Dakota Century Code permitting him to terminate the lease. Section 47–16–13, N.D.C.C., requires a lessee to give the lessor notice before vacating the premises. Additionally, Section 47–16–09, N.D.C.C., requires the lessee to "use ordinary care to preserve such property in safety and to keep it in good condition." We believe that those two sections, in conjunction with the fact that Stoller had been providing heat for the house, required him to, at a minimum, give notice to Hofmann of his intent to vacate the premises. Such a notification would have allowed Hofmann to make provisions for the heating of the house. We

therefore affirm the trial court's award of $202.97 to Hofmann.

■ Stoller lastly argues that his counterclaim for $3,300.00 should have been awarded to him by the court. He alleged in his counterclaim that because of cold weather and freezing water at Hofmann's home place, he was forced to sell his cows at a $3,300.00 loss. The trial court found that "the allegations set forth in [Stoller's] counterclaim were not proven by the greater weight of evidence and therefore" it dismissed Stoller's counterclaim. This finding of fact by the trial court is governed by Rule 52(a), N.D.R.Civ.P. We will not reverse findings of facts unless they are clearly erroneous. A review of the record discloses evidence to support the trial court's finding on this issue.

For the reasons stated in this opinion, we affirm the judgment.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.