2008 ND 144

In the Matter of the ESTATE OF Elsie G. THOMPSON, also known as Elsie Thompson, Deceased.

Andrea Willa Thompson, as Personal Representative of the Estate of Elsie G. Thompson, Deceased, Petitioner and Appellee

v.

Ardmore William Thompson, Respondent and Appellant.

No. 20070294.

Supreme Court of North Dakota.

July 21, 2008.

Albert J. Hardy, Hardy, Maus & Nordsven, P.C., Dickinson, N.D., for petitioner and appellee.

James D. Gion, Gion Law Office, Regent, N.D., for respondent and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] William Thompson appeals from a district court judgment entered in the probate of his mother's estate after the district court found he failed to prove he had an oral contract for deed to buy land from his parents, Ardmore and Elsie Thompson. We hold the district court's finding there was no oral contract for the sale of the land is not clearly erroneous, and we affirm.

I

[¶ 2] When Ardmore Thompson died in 2000, he and Elsie Thompson were the record title owners of approximately 1,180 acres of farm and ranch land in Adams County, which thereafter remained titled in Elsie Thompson's name as the surviving joint tenant. Elsie Thompson died in 2004. Her 1983 will, which generally devised her property to her four children, was admitted to probate, and her daughter, Andrea Thompson, was appointed personal representative of her mother's estate. In 2006, the personal representative petitioned the district court for an order compelling Elsie Thompson's son, William Thompson, to account for and deliver his mother's assets to the estate. William Thompson answered, claiming he had entered into an oral contract for deed to buy his parents' land in 1983; he had substantially complied with the terms of the oral contract for deed; and he was entitled to specific performance of the contract, i.e., a deed for the land from his mother's estate.

[¶ 3] According to William Thompson, he returned to his parents' farm from military duty in 1963, and he farmed and ranched with them for several years on a share basis, but he never received any compensation from them because "[t]hey had no money so there was nothing to get." In 1969, William Thompson bought land from a third party and started his own farming and ranching operation, but he also continued working with his parents on a share basis without ever receiving any compensation from them. William Thompson testified he offered to buy his parents' land on several occasions, but his father would not agree to sell the land. William Thompson claimed that in 1983, his father eventually offered to sell him the 1,180 acres for $150 per acre for a total price of $177,000, plus 6 percent interest, and he counter-offered for $125 per acre for a total purchase price of $147,500, plus 7 percent interest. William Thompson testified that he and his parents agreed at the kitchen table to his father's offer, which included the sale of cattle and machinery to William Thompson, and which permitted his parents to retain one-half of the oil leases for the land, to use the machinery, and to live on the homestead. William Thompson claimed the parties' agreement required him to pay for the land with 40 percent of the yearly proceeds from his cattle sales. Although the parties did not execute a written agreement or deed, William Thompson introduced evidence of his father's initial offer and the counter-offer written on scraps of paper, which William Thompson discovered after his father's death.

[¶ 4] There was no evidence that either William Thompson or his parents kept records of any payments by William Thompson for the purchase of the land. However, William Thompson presented evidence that proceeds from cattle sales were deposited into Ardmore Thompson's bank account through 1999. William Thompson testified he paid all the expenses related to the cattle, his father received all the proceeds from the sale of his father's cattle, and William Thompson paid his father 40 percent of the proceeds from the sale of William Thompson's cattle as payment for the land. According to William Thompson, he completed payments of principal and interest for the land sometime in 1990 or 1991; he paid approximately $402,000 to his parents from 1983 to 1999; and he initially paid more per year than required by the parties' agreement and continued making payments to his parents until 1999 because they needed the money.

[¶ 5] William Thompson testified he immediately took over management and operation of the farm and ranch in 1983, obtained crop insurance and liability insurance, and paid about $50,000 in real estate taxes on the land through 2005. In 1984, William Thompson applied to the Agricultural Stabilization and Conservation Service to reconstitute his bases for his farming operation to include the 1,180 acres, and the documentation for the application did not reflect that the 1,180 acres was leased. In financial statements regarding his farming and ranching operation, William Thompson referred to a contract for deed with his parents as a long-term debt. In 1985, Southwest Water Pipeline Authority obtained an easement across part of the land, which was signed as grantors by Ardmore and Elsie Thompson and by William Thompson and his wife and which included a notation that the land was not rented. William Thompson made improvements to the property while he was in possession of the land, including burying electrical lines to the homestead, installing water lines and a well for the homestead, and maintaining fencing. William Thompson testified that after the purchase agreement with his parents, his father quit raising cattle, and in 1986, his father transferred his cattle brand to William Thompson. According to William Thompson, on several occasions he suggested to his father that they execute a written contract for the sale of the land, but his father would "[t]urn around and walk away."

[¶ 6] Ardmore and Elsie Thompson's tax returns from 1983 through 2000 did not report a sale of the land to William Thompson or any interest payments received from William Thompson, and the parents depreciated the farm buildings on those returns. The parents' tax returns also reported farm rental income, and their tax preparer testified he was never informed that any of the land had been sold. Ardmore and Elsie Thompson's tax returns also reported the livestock sales as ordinary income from the sale of cattle.

[¶ 7] In 1989, Ardmore Thompson executed a will in which he left "[a]ll of my real estate which I may own at the time of my demise" to his four children and to William Thompson's wife in equal shares. In 1997, Ardmore Thompson executed a quit claim deed, placing the land in joint tenancy with Elsie Thompson. There was evidence that shortly before his death, Ardmore Thompson gave a bill of sale for his livestock to William Thompson, acknowledging the livestock had been paid for in full, and William Thompson made no further payments of cattle proceeds to Elsie Thompson after Ardmore Thompson's death in 2000.

[¶ 8] After a bench trial, the district court found William Thompson failed to prove by clear and definite proof that he had an oral contract for deed to buy the

land from his parents. The court found that William Thompson failed to prove his payments to his parents were for the purchase of the land and that the consent necessary for an agreement between the parties was lacking. The court found William Thompson's possession of the land was consistent with a lease; William Thompson's improvements to the land were not valuable, substantial, and permanent and were equally consistent with a lease; William Thompson's financial statements conflicted with claimed payments for the land in several respects, and his payments appeared to apply to the cattle arrangement and lease payments and not to a land purchase; and Ardmore Thompson walked away from William Thompson when William Thompson suggested the need for a written contract, which established Ardmore Thompson did not agree to sell the land to William Thompson. The court decided William Thompson's part performance was not consistent with only an oral contract for the sale of the land and he was not entitled to specific performance of the alleged oral contract for the sale of the land. The court granted possession of the land to the personal representative and ordered William Thompson to provide an accounting for his use of the land from 2000 through 2007.

## II

[¶ 9] William Thompson argues the district court clearly erred in finding he did not have an oral contract with his parents to purchase their land. He claims the court's finding there was no oral contract was induced by an erroneous view of the law, because the court confused whether a contract had been formed with whether the contract survived the statute of frauds and used criteria for the statute of frauds to decide whether a contract existed. He contends the court looked at each fact separately rather than looking at the composite facts and circumstances.

[¶ 10] The existence of an oral contract is a question of fact. *Kuntz v. Kuntz*, 1999 ND 114, ¶ 7, 595 N.W.2d 292. In an appeal from a judgment entered after a bench trial, a district court's findings of fact are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a). *Fladeland v. Gudbranson*, 2004 ND 118, ¶ 7, 681 N.W.2d 431. "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made." *Id.* A district court's choice between two permissible views of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the district court. *Edward H. Schwartz Constr., Inc. v. Driessen*, 2006 ND 15, ¶ 7, 709 N.W.2d 733. In a bench trial, the district court decides credibility issues. *Id.* We give due regard to the district court's opportunity to assess the witnesses' credibility, and we do not second guess the court on its credibility determinations nor do we reweigh the evidence. *Id.*

[¶ 11] The requisites for a valid contract are parties capable of contracting, consent, a lawful object, and sufficient consideration. N.D.C.C. § 9–01–02; *Kuntz*, 1999 ND 114, ¶ 7, 595 N.W.2d 292; *Cooke v. Blood Systems, Inc.*, 320 N.W.2d 124, 128 (N.D.1982). *See Anderson v. Mooney*, 279 N.W.2d 423, 426–27 (N.D.1979). The parties' consent must be free, mutual, and communicated to each other. N.D.C.C. § 9–03–01; *Kuntz*, at ¶ 7; *Anderson*, at 426–27. Under N.D.C.C. § 9–03–16, "[c]onsent is not mutual unless the parties all agree upon the same thing in the same sense." *See Anderson*, at 427.

[¶ 12] In some contexts, this Court has recognized that oral contracts must be established by a preponderance of the evidence. *Matter of Estate of Hill*, 492

N.W.2d 288, 293–94 (N.D.1992) (oral loan contract); *Hofmann v. Stoller,* 320 N.W.2d 786, 790–91 (N.D.1982) (part performance of oral contract for sale of feed under Uniform Commercial Code). But, in the context of contracts for the sale of land, the statute of frauds provides that an agreement for the sale of real property is invalid unless the agreement is in writing and subscribed by the party to be charged. N.D.C.C. § 9–06–04(3); *Fladeland,* 2004 ND 118, ¶ 8, 681 N.W.2d 431; *Anderson,* 279 N.W.2d at 427–30; *Syrup v. Pitcher,* 73 N.W.2d 140, 144 (N.D.1955). In the absence of a written contract or agreement, N.D.C.C. § 47–10–01 allows a "court to compel the specific performance of any agreement for the sale of real property in case of part performance thereof." *Fladeland,* 2004 ND 118, ¶ 8, 681 N.W.2d 431; *Anderson,* 279 N.W.2d at 427. Part performance of an oral contract must be consistent only with the existence of the alleged oral contract. *Fladeland,* at ¶ 8; *Anderson,* at 429; *Buettner v. Nostdahl,* 204 N.W.2d 187, 195 (N.D.1973) *overruled on other grounds in Shark v. Thompson,* 373 N.W.2d 859, 867–69 (N.D.1985). Valuable, substantial, and permanent improvements may be considered part performance, removing an oral contract from the statute of frauds. *Green v. Gustafson,* 482 N.W.2d 842, 848 (N.D.1992); *Syrup,* 73 N.W.2d at 142. If, however, the improvements indicate some other relationship, such as a landlord and tenant relationship, or can be accounted for through the application of some other hypothesis, they are not sufficient to constitute part performance removing the contract from the statute of frauds. *Fladeland,* at ¶ 8; *Anderson,* at 429; *Buettner,* at 195.

[¶ 13] In *Anderson,* at 429 (quoting *Buettner,* at 195) we explained the quantum of proof necessary to successfully assert part performance of an oral contract for the sale of land in the context of a claim for specific performance:

"As evidenced by the test required in this state to successfully assert part performance, the court's overriding concern *is precisely directed toward and concerned with a quantum of proof certain enough to remove doubts as to the parties' oral agreement:*

" 'The first requirement of the doctrine that part performance of an oral contract exempts it from the provisions of the statute of frauds is that the contract be proven by evidence that is clear and unequivocal and which leaves no doubt as to the terms, character, and existence of the contract. * * *

" 'A mere preponderance of the evidence is not sufficient. If the evidence leaves it at all doubtful as to whether or not a contract was entered into, the court will not decree specific performance. * * * * * * * * *

" 'Another requirement of the doctrine * * * is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they point to some other relationship, such as that of landlord and tenant, or may be accounted for on some other hypothesis, they are not sufficient.' "

[¶ 14] Here, the district court found the improvements to the property made by William Thompson did not increase the value of the property; the income tax returns filed by Ardmore and Elsie Thompson after 1983 did not report or reflect a sale of the land to William Thompson; and William Thompson's financial statements conflicted with his claimed payments for the land in several respects. The court found William Thompson's payments appeared to apply to a "cattle arrangement and/or lease payments for the property" and not to the purchase of the land. The court said Ardmore Thompson's actions in walking away from William Thompson when asked to execute a written contract

established Ardmore Thompson did not agree to sell the land. The court decided the part performance by William Thompson was not consistent with only an oral contract; William Thompson failed to clearly and definitely prove payments made by him were for the purchase of the real estate; and he failed to prove by clear and definite evidence the existence of an oral contract for the sale of land which possessed all the necessary elements and features of an enforceable agreement. Although the district court's findings about the existence of an oral agreement considered criteria relevant to the statute of frauds and specific performance in the context of finding there was no contract for the sale of land, the court's findings reflect a correct application of the burden of proof for claims for specific performance of an alleged oral contract to convey land. *See Cooke*, 320 N.W.2d at 129; *Anderson*, 279 N.W.2d at 429; *Buettner*, 204 N.W.2d at 195; *Syrup*, 73 N.W.2d at 144.

[¶ 15] We do not reweigh the evidence or second guess the district court on its credibility determinations. There is evidence in this record that supports the district court's findings, and we are not left with a definite and firm conviction the court made a mistake in finding William Thompson failed to prove the existence of an oral contract for the sale of the land. We therefore conclude the district court's findings are not clearly erroneous.

### III

[¶ 16] We affirm the district court judgment.

[¶ 17] DALE V. SANDSTROM, DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.