2012 ND 37

**Mark RICKERT, Plaintiff and Appellee,**

**v.**

**DAKOTA SANITATION PLUS, INC., a North Dakota Corporation, and Peggy Becker, individually, as a director of Dakota Sanitation Plus, Inc., and as an officer of Dakota Sanitation Plus, Inc., Defendants and Appellants.**

**No. 20110158.**

Supreme Court of North Dakota.

Feb. 17, 2012.

414

Ariston Edward Johnson (argued), Watford City, N.D. and David Del Schweigert (appeared), Bismarck, N.D., for plaintiff and appellee.

Robert V. Bolinske, Bismarck, N.D., for defendants and appellants.

KAPSNER, Justice.

[¶ 1] Dakota Sanitation Plus, Inc. ("DSP") and Peggy Becker appeal from a district court judgment awarding Mark Rickert the value of his shares in DSP at the time the corporation was dissolved in December 2007. We affirm.

## I

[¶ 2] Harvey Rickert was the father of Mark Rickert and Kim Rickert. Prior to his death in 1998, Harvey Rickert operated an unincorporated trash removal business called Dakota Sanitation which had a contract to provide residential trash removal for the City of Mandan. Becker lived with and was engaged to Harvey Rickert, and she worked in the trash removal business with him. Shortly before his death, Harvey Rickert signed a written document stating:

> On this day, January 14, 1998, I, Harvey Rickert, would like to state my wishes in the event of my death. I wish to divide the profits of the contract from November of 1997 to October of 2007 from the City of Mandan between Kim Rickert, Mark Rickert, Peggy Becker and Delton Heid. The profits, after all expenses are paid, should be divided with Delton Heid receiving 15% of the profits as long as he is employed by Dakota Sanitation. Kim Rickert, Mark Rickert and Peggy Becker would equally divide the remaining 85%. The two trucks used for this Mandan route shall be given to Peggy Becker. The contract in 2007 shall go to Peggy Becker, who shall, if I am alive, pay a sum of $2,000 per month to Harvey Rickert. Peggy Becker would also have the right to bid the contract using the name Dakota Sanitation.

The parties concede this document was not a valid testamentary instrument.

[¶ 3] Harvey Rickert died on January 25, 1998. Becker, Mark Rickert, and Kim Rickert thereafter incorporated DSP, with each owning one-third of the shares. Becker was the president of the corporation and was in charge of its daily operations. The three stockholders shared the corporate profits equally.[1] DSP provided residential trash removal under the existing contract with Mandan and, when that contract expired in October 2007, DSP was awarded a new contract for trash removal in Mandan through October 2012.

[¶ 4] Becker contends the shareholders in DSP had entered into an unwritten agreement which provided that, after expiration of the original Mandan contract in 2007, the corporation would be dissolved, Becker would receive all the assets of DSP, and Becker would acquire "the sole and exclusive right to the City of Mandan contract." At a special shareholders' meeting in December 2007, Becker and Kim Rickert voted to dissolve DSP. Mark Rickert voted against dissolution. All of the corporate assets, including the new Mandan contract, were subsequently transferred to Armstrong Sanitation and Rolloff, Inc., a separate corporation solely owned by Becker.

[¶ 5] Mark Rickert made a written demand for payment of the fair value of his shares as a dissenting shareholder under N.D.C.C. § 10–19.1–87. When DSP and Becker failed to comply with Mark Rickert's demand, he brought this action seeking recovery of the fair value of his shares on the date of dissolution and damages for fraud. DSP and Becker answered and counterclaimed, with Becker seeking damages against Mark Rickert for unjust enrichment. DSP and Becker argued that Mark Rickert was not entitled to payment for the value of his shares because of the alleged unwritten shareholder agreement that DSP would be dissolved in 2007 and Becker would receive all of the corporate assets, with no compensation to Mark Rickert or Kim Rickert.

[¶ 6] Mark Rickert moved for partial summary judgment on the issue of existence of the alleged agreement, and the district court concluded there was no implied or oral contract among the shareholders. A bench trial was held to determine the value of the corporation, and the district court found the value of the corporation at the time of dissolution was $557,273. Partial judgment was entered awarding Mark Rickert the fair value of his shares as of the date of dissolution, plus interest, costs, and attorney fees. The parties stipulated to dismissal of all remaining claims, and a final judgment was entered.

II

[¶ 7] DSP and Becker contend the district court erred in granting partial summary judgment determining that there was no agreement among the parties to dissolve the corporation in 2007 and to give Becker all of the corporation's assets, including the Mandan contract, without any remuneration to the other shareholders.

[¶ 8] We have outlined the standards governing summary judgment under N.D.R.Civ.P. 56:

"Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be

---

1. Delton Heid, a long-time employee of Dakota Sanitation, apparently received payments based upon a percentage of the profits of DSP until he quit working for the corporation, but he was never a shareholder.

drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record."

*Richard v. Washburn Pub. Sch.*, 2011 ND 240, ¶ 9, 809 N.W.2d 288 (quoting *Loper v. Adams*, 2011 ND 68, ¶ 19, 795 N.W.2d 899). A party opposing a properly supported motion for summary judgment must demonstrate there is a genuine issue of material fact:

If the moving party meets its initial burden of showing the absence of a genuine issue of material fact, the party opposing the motion may not rest on mere allegations or denials in the pleadings but must present competent admissible evidence to show the existence of a genuine issue of material fact. Mere speculation is not enough to defeat a motion for summary judgment, and when no pertinent evidence on an essential element is presented to the district court in resistance to the motion for summary judgment, it is presumed no such evidence exists.

*Beaudoin v. JB Mineral Servs., LLC*, 2011 ND 229, ¶ 7, 808 N.W.2d 671 (citation omitted).

[¶ 9] The linchpin of DSP and Becker's argument on appeal is their contention that, when DSP was incorporated after Harvey Rickert's death in 1998, the shareholders entered into an implied oral agreement that the corporation would be dissolved in 2007 and Becker would be given all of its assets. Section 10–19.1–83, N.D.C.C., authorizes a procedure for shareholders of a corporation to agree to provisions governing the control, liquidation, and dissolution of the corporation. The procedure outlined in the statute, however, requires that the agreement be in writing, signed by all of the shareholders of the corporation, and filed with the corporation. DSP and Becker concede that the agreement in this case does not comply with the requirements of the statute, but argue that the statute does not provide the exclusive method for shareholders to agree on matters relating to liquidation and dissolution of the corporation. DSP and Becker rely upon subsection 6 of N.D.C.C. § 10–19.1–83, which provides:

This section does not apply to, limit, or restrict agreements otherwise valid, nor is the procedure set forth in this section the exclusive method of agreement among shareholders or between the shareholders and the corporation with respect to any of the matters described in this section.

DSP and Becker contend that, under N.D.C.C. § 10–19.1–83(6), an unwritten agreement by shareholders to dissolve a corporation on a certain date and to transfer all corporate assets to one shareholder is enforceable.

[¶ 10] Section 10–19.1–83(6), N.D.C.C., while recognizing that the statute is not the exclusive method of agree-

ment among shareholders regarding the described subject matter, specifically notes that any other agreement must be "otherwise valid." Therefore, any other form of agreement addressing control, liquidation, or dissolution of a corporation needs to be "otherwise valid" under generally applicable principles of contract law. One of the generally applicable principles of contract law is the statute of frauds. Under N.D.C.C. § 9–06–04(1), "[a]n agreement that by its terms is not to be performed within a year from the making thereof" is "invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by the party's agent." The statute applies to any contract which by its express terms cannot be fully performed within one year. *First State Bank of Goodrich v. Oster*, 500 N.W.2d 593, 597 (N.D.1993); *Thompson v. North Dakota Workers' Comp. Bureau*, 490 N.W.2d 248, 252 (N.D.1992). The alleged unwritten agreement in this case provided that the three shareholders would each receive equal shares of the corporate profits from 1998 to 2007, and then would dissolve the corporation and transfer all assets to Becker. DSP and Becker do not argue that there is a writing or memorandum signed by Mark Rickert evidencing the alleged agreement, nor do they contend it was possible to perform the agreement within one year from its making. By its express terms the alleged agreement was not to be performed within one year, and it clearly fell within the scope of N.D.C.C. § 9–06–04(1).

[¶ 11] DSP and Becker contend that, although the alleged agreement would ordinarily be barred by the statute of frauds, it is taken out of the statute of frauds in this case by partial performance. Specifically, DSP and Becker contend that Mark Rickert's receipt of one-third of the corporate profits from 1998 to 2007 dem-

onstrated that he was accepting benefits in accordance with the alleged agreement and constituted partial performance sufficient to take the agreement out of the statute of frauds.

[¶ 12] This Court has previously questioned whether the doctrine of partial performance applies to an oral agreement which by its terms cannot be performed within one year and which does not involve real estate:

We also observe that the general rule is that under provisions similar to Section 9–06–04(*l* ), N.D.C.C., contracts which cannot be performed within one year are not taken out of the statute of frauds by part performance. However, that general rule is subject to an exception for cases involving real estate.

*Thompson*, 490 N.W.2d at 252 n. 3 (citations omitted); *see* 73 Am.Jur.2d *Statute of Frauds* § 419 (2001); 37 C.J.S. *Frauds, Statute of* § 191 (2008). In this case, as in *Thompson*, we deem it unnecessary to decide whether an agreement unrelated to real estate which cannot be performed within one year can be removed from the statute of frauds by partial performance, because we conclude DSP and Becker failed to present competent admissible evidence demonstrating partial performance sufficient to take the alleged contract out of the statute of frauds.

[¶ 13] In support of their contention that there has been partial performance sufficient to remove the alleged agreement from the statute of frauds, DSP and Becker rely solely upon evidence showing Mark Rickert accepted a share of the profits from the corporation. DSP and Becker repeatedly argued: "plaintiff Mark Rickert accepted the benefits of the agreement between the parties for ten years;" "he has been paid each and every month for the entire ten year period;" "[o]ver the next ten years, plaintiff Mark Rickert, while

doing essentially no work whatsoever for the business, collected monthly payments specifically pursuant to [Harvey Rickert's] writing and agreement of the parties;" "for over 10 years he contributed virtually nothing to the running of the subject business but during that entire period of time accepted monthly payments in exact accordance with the terms of the agreement;" "[i]t ... would be inequitable for plaintiff Rickert to both accept and retain the ten years of monthly payments and, contrary to the agreement of the parties, also continue to have an ownership in the assets of the corporation;" and, "[h]is acceptance of those benefits demonstrates his consent to the agreement which all parties followed."

[¶ 14] When it is alleged that partial performance removes an unwritten agreement from the statute of frauds, the most important question is whether the part performance is consistent only with the existence of the alleged oral contract *In re Estate of Thompson*, 2008 ND 144, ¶ 12, 752 N.W.2d 624; *Fladeland v. Gudbranson*, 2004 ND 118, ¶ 8, 681 N.W.2d 431; *Johnson Farms v. McEnroe*, 1997 ND 179, ¶ 19, 568 N.W.2d 920. As further clarified in *Estate of Thompson*, at ¶ 13 (quoting *Anderson v. Mooney*, 279 N.W.2d 423, 429 (N.D.1979)):

> " 'Another requirement of the doctrine * * * is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they point to some other relationship ... or may be accounted for on some other hypothesis, they are not sufficient.' "

*See also Buettner v. Nostdahl*, 204 N.W.2d 187, 195 (N.D.1973), *overruled on other grounds by Shark v. Thompson*, 373 N.W.2d 859, 867–69 (N.D.1985).

[¶ 15] In order to survive Mark Rickert's properly supported motion for summary judgment, DSP and Becker were required to present competent admissible evidence demonstrating an act of partial performance which was consistent only with the existence of the alleged unwritten contract and which could not " 'be accounted for on some other hypothesis.' " *Estate of Thompson*, 2008 ND 144, ¶ 13, 752 N.W.2d 624 (quoting *Anderson*, 279 N.W.2d at 429). It is certainly not uncommon, however, for a passive shareholder in a closely held corporation to receive a share of the profits, and distribution of corporate profits to shareholders is expressly provided for in N.D.C.C. § 10–19.1–92. Mark Rickert's acceptance of his share of the profits of the corporation although providing no work is entirely consistent with the benefits routinely afforded to a passive shareholder. He owned one-third of the shares and received one-third of the profits. It can hardly be argued that his acceptance of his share of the profits is consistent only with an alleged oral agreement to dissolve the corporation several years later and allow Becker to receive all of the corporation's assets.

[¶ 16] If the parties had intended to limit the duration of the corporation at the time of incorporation, *see* N.D.C.C. § 10–19.1–10(2)(b), or to provide for a specific distribution of assets upon dissolution, they could have simply included such provisions in the articles of incorporation or complied with the requirements of N.D.C.C. § 10–19.1–83. DSP and Becker now claim the parties entered into an unwritten agreement to dissolve the corporation some nine years later and to give all of the assets, including the renewed Mandan contract, to Becker. They further seek to avoid the statute of frauds by claiming partial performance, but point to no evidence of any conduct or action of the parties prior to the 2007 dissolution that is inconsistent with the usual and ordinary

operation of a closely held corporation with passive shareholders.

[¶ 17] After review of the entire record, and viewing the evidence in the light most favorable to DSP and Becker, we conclude the alleged agreement was barred by the statute of frauds as a matter of law and the district court did not err in granting partial summary judgment determining there was not an enforceable agreement between the parties to dissolve the corporation in 2007 and to give all of the corporation's assets to Becker.

### III

[¶ 18] DSP and Becker contend that the district court erred in denying discovery on the issue of damages, claiming the court erroneously allowed Mark Rickert to provide a "bill of particulars" of his claimed damages rather than specifically answering the interrogatories propounded by DSP and Becker. DSP and Becker also contend the court erred in allowing Mark Rickert's expert witness to testify and in effectively denying a motion for continuance when the expert's report was not completed until the day before trial and they did not receive a copy of the report before trial.

[¶ 19] The trial court has broad discretion over discovery disputes, and this Court applies a very limited standard of review:

"A district court has broad discretion regarding the scope of discovery, and its discovery decisions will not be reversed on appeal absent an abuse of discretion." *Investors Title Ins. Co. v. Herzig*, 2010 ND 169, ¶ 38, 788 N.W.2d 312 (quoting *Martin v. Trinity Hosp.*, 2008 ND 176, ¶ 17, 755 N.W.2d 900). "A party asserting the court abused its discretion in denying discovery carries a heavy burden." *Id.*

An abuse of discretion by the district court is never assumed, and the burden is on the party seeking relief affirmatively to establish it. The district court abuses its discretion only when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination. The party seeking relief must show more than the district court made a "poor" decision, but that it positively abused the discretion it has under the rule. We will not overturn the district court's decision merely because it is not the decision we may have made if we were deciding the motion.

*Id.* (quoting *Martin*, at ¶ 17).

*Leno v. K & L Homes, Inc.*, 2011 ND 171, ¶ 23, 803 N.W.2d 543.

### A

[¶ 20] DSP and Becker first contend the district court erred when it allowed Mark Rickert to submit a "bill of particulars" of the damages sought.

[¶ 21] In order to place this argument in context, it is necessary to outline the procedural posture of the case. The discovery process engaged in by the parties in this case was contentious, including numerous motions to compel, motions for sanctions, a motion for appointment of a discovery master, hearings before the court, and numerous discovery orders. Early in the proceedings, DSP and Becker served interrogatories upon Mark Rickert. Included in the 75 interrogatories were approximately 50 nearly identical, boilerplate interrogatories which essentially enumerated each paragraph of Mark Rickert's complaint and for each directed that he "set forth in detail all facts upon which you rely for the allegations contained in paragraph [X] of your Complaint, and identify

all documents you claim support said allegation." For those paragraphs in the complaint alleging damages, the corresponding interrogatories generally requested that Mark Rickert "set forth each and every item of damage you claim as alleged in paragraph [X] of your Complaint set forth exactly how in detail each such item was computed, the identity of each person involved in said computation, and identify all documents you claim support said allegation." Mark Rickert objected to most of the interrogatories, and the court considered the matter along with several other discovery disputes at a hearing on July 13, 2009. In the context of the various discovery disputes, the court noted that the interrogatories essentially sought an itemization of damages and clarification of the fraud allegations:

THE COURT: ...

Now then, let me go to the Defendant's interrogatories. First of all, I'm going to cause—I note, Mr. Johnson, that in the plaintiff's complaint, and which Mr. Bolinske by his interrogatories had requested, essentially, what I would term a bill of particulars and particularly with the nature of damages claimed and the assertion of fraud under paragraph or claim number 6.

I'm going to cause the plaintiff by July 27 of 2009, to itemize damage claims. By doing so, it is not the intent of the Court to cause the Plaintiff to forego any residual claims or to compromise any claims, but rather in the context of a bill of particulars, that to disclose an itemization of damages asserted and the bases for those damages under each of your claims. Again by the 27th of July, 2009.

That once the same has been disclosed, the Court will then revisit Defendant's interrogatories so as to see whether or not there are additional interrogatories in supplementation of the claim itemization as herein ordered.

Now, Mr. Bolinske, does that give you a starting point?

MR. BOLINSKE: Yes, it does, Your Honor.

[¶ 22] The court clearly indicated that this was merely a "starting point" and it would "revisit" the interrogatories if necessary after the itemization had been made. Counsel for DSP and Becker did not object to, but apparently agreed with, this procedure at the time. It appears that the district court, faced with voluminous "shotgun" interrogatories, attempted to pare down the scope of discovery by requiring Mark Rickert to itemize the claimed damages and provide further details of the claimed fraud as a "starting point" for future discovery requests. In doing so, the court unfortunately used the term of art "bill of particulars."

[¶ 23] As DSP and Becker point out, our rules of procedure do not recognize use of a "bill of particulars" in a civil case. *Cf.* N.D.R.Crim.P. 7(f) (court may direct the filing of a bill of particulars in a criminal case). Although the district court's use of the label "bill of particulars" may have caused some confusion, the procedure employed was properly intended to narrow and focus the scope of further discovery by requiring Mark Rickert to more clearly outline the basis for the damages he sought and to delineate and clarify his allegations of fraud. DSP and Becker did not object to this procedure at the time, and have not drawn our attention to any specific interrogatory that was not responded to which caused them prejudice.

[¶ 24] Although the district court's use of the term "bill of particulars" may have been unfortunate, DSP and Becker have not demonstrated that the court acted in an arbitrary, unreasonable, or unconscionable manner, or that its decision was not

the product of a rational mental process leading to a reasoned determination. *See Leno*, 2011 ND 171, ¶ 23, 803 N.W.2d 543. We conclude that the discovery procedure ordered by the district court did not constitute an abuse of discretion.

B

[¶ 25] DSP and Becker also contend that the district court erred in allowing Mark Rickert's expert witness to testify and in effectively denying a motion for a continuance when the witness's report was not completed until the day before trial and DSP and Becker did not receive a copy of the report before trial.

[¶ 26] The sole issue which actually went to trial in this case was the value of the corporation as of the date of dissolution in 2007. In the "bill of particulars" Mark Rickert submitted in response to the district court's discovery order, he indicated he would be securing an expert witness once sufficient corporate financial information was received in discovery:

> The actual amounts of these items of damages cannot be calculated at this time because the case remains in the early phases of discovery. The Plaintiff intends to collect sufficient data through discovery to submit to one or more experts who will be able to form an opinion as to the value of Dakota Sanitation Plus, Inc., as a going concern at the time of its dissolution.

On May 17, 2010, more than three months before trial, Mark Rickert served a witness list upon DSP and Becker's counsel identifying Dianna Kindseth, an accountant, as an expert who would testify regarding the valuation of the corporation and the valuation of corporate contracts. Counsel for DSP and Becker did not attempt to depose Kindseth, nor did he serve an interrogatory under N.D.R.Civ.P. 26(b)(4)(A) requesting disclosure of the substance of the facts and opinions to which Kindseth would testify or a summary of the grounds for her opinions.

[¶ 27] When Mark Rickert called Kindseth as a witness at trial, DSP and Becker objected, arguing that Kindseth had not been identified in answers to their original interrogatories or in the "bill of particulars" served by Mark Rickert and that the May 17, 2010, identification in a witness list came after expiration of the court's deadline for discovery. Counsel for Mark Rickert responded that the deadline for discovery had been extended by stipulation of the parties after counsel for DSP and Becker had twice failed to appear at scheduled depositions of Craig Anderson, the corporation's accountant. Mark Rickert's counsel further explained that Kindseth's report was delayed by the ongoing difficulties and obstructions in discovery:

> [MR. SCHWEIGERT] Time came for Mr. Anderson's deposition the first time, and the Court is well aware of what happened on those occasions when Mr. Anderson unfortunately showed for his deposition on two occasions but Mr. Bolinske failed to show on those occasions.
>
> When the time came for us to—obviously, until we had the information from Mr. Anderson, we were kind of boot strapped, frankly, in doing a valuation of this business.
>
> After we finally got the information from Mr. Anderson and the necessary documents that we have pursuant to the court's order, in a plaintiff's witness list, as directed by the court to identify, dated May 17, 2010, we identified Dianna Kindseth who was expected to be called as an expert witness in [the] field of valuation of a corporation, to wit, and that sort of thing.
>
> Frankly, we didn't have the necessary information until very recently here. We gave her the necessary information,

but it obviously takes her a while to do a complete valuation. Unfortunately, due to the delay[s] that have been caused by things that were out of our control, we actually were unable to get the valuation until Friday. We got basically a rough estimate of what it would be, and just yesterday we actually got the completed summary.

THE COURT: Mr. Bolinske, did you on May 17, 2010, become aware of Dianna Kindseth's involvement?

MR. BOLINSKE: When that was received, yes, we did.

THE COURT: And have you since that time attempted to take Ms. Kindseth's deposition?

MR. BOLINSKE: Your Honor, the discovery order indicated that it was due—discovery expired on April 1st. The stipulated that Mr. Schweigert refers to related only to Mr. Anderson. It was at my suggestion, because it was tax time. It did not relate to any other expert witness other than Mr. Anderson. And we did that to accommodate him because it was tax season.

THE COURT: Well, I understand that portion. But I also understand that this is a valuation of an ongoing or at that time a functional business, since defunct, but it also relies a large part on the accounting prepared of the business itself.

Now, my question is: When you received this on May 17, we are here on August 31, did you take any steps to cause the court to address the issue?

MR. BOLINSKE: No, I did not, Your Honor.

THE COURT: Objection overruled. The witness may testify.

 [¶ 28] DSP and Becker contend on appeal that the court erred in allowing Kindseth to testify at trial because they did not receive a copy of Kindseth's report before trial and Mark Rickert had failed to update discovery responses with information regarding Kindseth's anticipated testimony. The record demonstrates, however, that DSP and Becker never requested the information in the report through a proper interrogatory under N.D.R.Civ.P. 26(b)(4)(A)(i). Unlike the federal rules, which require automatic disclosure of an expert witness's report, our rules require that the opposing party specifically request disclosure of the facts and opinions to which the expert will testify and the grounds for each opinion. *Compare* N.D.R.Civ.P. 26(b)(4), *with* Fed.R.Civ.P. 26(a)(2)(A). There is no requirement to provide a report or other details of the expert's opinion unless the opposing party expressly requests it by interrogatory or deposition. *See* N.D.R.Civ.P. 26(b)(4)(A).

[¶ 29] DSP and Becker do not point to any interrogatory or other discovery request which required Mark Rickert to disclose "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." N.D.R.Civ.P. 26(b)(4)(A)(i). The vague boilerplate interrogatories served by DSP and Becker, which essentially asked Mark Rickert to set forth in detail all facts, all witnesses, and all documents supporting all of his claims, do not comply with the requirements of N.D.R.Civ.P. 26(b)(4)(A)(i). We conclude the court did not abuse its discretion in allowing Kindseth to testify as an expert regarding the value of the corporation.

C

 [¶ 30] After the court ruled Kindseth would be allowed to testify, DSP and Becker moved for a continuance. The court held that Kindseth would be allowed to testify that day as scheduled, and the trial would be continued for one day to

allow DSP and Becker an opportunity to secure an expert witness. DSP and Becker contend the court's action essentially constituted a denial of their motion, and the court erred in not continuing the trial for a sufficient time to allow them to secure an expert witness to respond to Kindseth's testimony.

[¶ 31] The district court has broad discretion over the progress and conduct of a trial, and the determination whether to grant a continuance lies within the sound discretion of the district court. *Lund v. Lund*, 2011 ND 53, ¶ 7, 795 N.W.2d 318. We will not reverse a district court's decision to deny a motion for a continuance absent an abuse of discretion. *Id.*

[¶ 32] DSP and Becker argue that a one-day continuance to locate an expert witness is not a reasonable continuance, and that they were "severely prejudiced" by their inability to challenge Kindseth's testimony with an opinion from their own expert. DSP and Becker, however, had ample opportunity to secure their own expert before trial. The case had been pending for more than two years, and it was clear from the outset that valuation of the corporation would be a key issue in the case. They further knew more than three months before trial that Mark Rickert intended to have Kindseth testify as an expert regarding the value of the corporation. DSP and Becker, however, did nothing to procure their own expert, but then claimed surprise and sought a continuance when Kindseth, as promised, was called as an expert witness.

[¶ 33] Any prejudice to DSP and Becker caused by their inability to respond to Kindseth's expert testimony with an expert of their own was the result of their own voluntarily made choices, not an abuse of discretion by the court. We conclude the district court did not abuse its discre-tion by failing to grant a longer continu-ance to allow DSP and Becker to secure an expert witness.

IV

[¶ 34] DSP and Becker contend the district court erred in failing to consid-er relevant evidence on the issue of the value of the corporation.

[¶ 35] Kindseth, Mark Rickert's expert witness, testified at length about her meth-odology for valuing the corporation and testified that the value of DSP on the date of dissolution in December 2007 was $557,273. When Becker was asked her opinion on the value of the corporation, the court sustained an objection based on Becker's failure to give a value when spe-cifically asked at her deposition. During an offer of proof on the issue, Becker testified she believed the corporation had a value of $275,000, based upon the actual profits made on the Mandan contract by her corporation, Armstrong Sanitation and Rolloff, Inc. ("Armstrong"), in 2008 and 2009. She testified that actual profits on the Mandan contract in 2008 and 2009 were lower than in prior years because of higher expenses, including wage increases, rent increases, and fuel costs. Kim Rick-ert was allowed to testify that he believed DSP had a value between $250,000 and $275,000, based upon the lower actual prof-its earned by Armstrong in 2008 and 2009. The court found the value of the corpora-tion on the date of dissolution was $557,273.

[¶ 36] DSP and Becker contend that the court "forgot" that both Becker and Kim Rickert testified to the value of the corporation, pointing to the following lan-guage in the court's Memorandum Deci-sion: "the only valuation of DSP, Inc., as of December 21, 2007, the date of dissolu-tion, is the fair value determined by Dian-

na L. Kindseth." They further contend the court should have considered the actual profits of Armstrong from 2008 and 2009 in determining the value of DSP in December 2007.

[¶ 37] Initially, we note that Becker's testimony was not admitted at trial and came in only as part of an offer of proof. DSP and Becker have not challenged the court's evidentiary ruling excluding Becker's testimony on this issue. The court therefore did not "forget" to consider evidence it had ruled was inadmissible.

[¶ 38] More significantly, however, DSP and Becker's argument demonstrates a fundamental misunderstanding of the remedy available to a dissenting shareholder under N.D.C.C. § 10–19.1–87.[2] Section 10–19.1–87(1), N.D.C.C., allows a dissenting shareholder to "obtain payment for the fair value of the shareholder's shares." "Fair value of the shares" is defined as "the value of the shares of a corporation immediately before the effective date of a corporate action" which triggers the dissenting shareholder's rights. N.D.C.C. § 10–19.1–88(1)(b). When the district court indicated that Kindseth's testimony was the only valuation of DSP, the court clearly stressed that it was the only valuation "as of December 21, 2007, the date of dissolution." When testifying regarding their opinions of the value of the corporation, both Becker and Kim Rickert testified that their valuations were based upon the actual profits received by Armstrong in 2008 and 2009. When Becker and Kim Rickert attempted to testify about the actual profits earned by Armstrong in 2008 and 2009, Mark Rickert repeatedly objected and the district court repeatedly indicated that it considered any evidence of Armstrong's profits received after the 2007 dissolution of DSP to be irrelevant to the determination of the value of DSP at the time of dissolution.

[¶ 39] The statutory scheme clearly indicates that post-event occurrences have no bearing on the valuation of stock to be awarded to a dissenting shareholder; rather, it is the value of the dissenting shareholder's shares "immediately before the effective date of a corporate action" that controls. *See* N.D.C.C. § 10–19.1–88(1)(b). In other words, Mark Rickert was entitled to the value of his shares as if they had been valued and disposed of on December 21, 2007, without taking into consideration the actual profits earned by a different corporation, operating with different management practices and under different circumstances, in subsequent years. The intent of the dissenting shareholder provisions is to provide the fair value of shares to a dissenting shareholder as it existed immediately before the triggering event. Changes in economic circumstances occurring after the corporate action which affect the value of the shares are irrelevant to the determination of the fair value of the shares under N.D.C.C. §§ 10–19.1–87 and 10–19.1–88.

[¶ 40] We conclude the district court did not fail to consider relevant evidence on the issue of the value of the corporation.

## V

[¶ 41] We have considered the remaining issues and arguments raised by the parties and find them to be either unneces-

---

**2.** The parties have not questioned on appeal whether dissolution is an event which triggers a dissenting shareholder's right to seek the remedies available under N.D.C.C. § 10–19.1–87. Accordingly, for purposes of this appeal we will assume that a shareholder who dissents from a vote to dissolve the corporation may seek remedies as a dissenting shareholder under N.D.C.C. § 10–19.1–87.

sary to our decision or without merit. The judgment is affirmed.

[¶ 42] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, DANIEL J. CROTHERS and DALE V. SANDSTROM, JJ., concur.